Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Suzanne B. Conlon | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 6972 | **DATE** | 4/18/2002 |
| **CASE TITLE** | ROBERT HIGDON vs. ENTENMANN'S SALES CO., et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
  ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] The motions for summary judgment [10-1] [14-1] are denied. The joint final pretrial order and agreed jury instructions shall be presented on May 9, 2002 at 9:00 a.m. Plaintiff's draft shall be submitted to defendants by May 2, 2002. Trial is set on May 29, 2002 at 9:00 a.m. ENTER MEMORANDUM OPINION AND ORDER.

*Suzanne B. Conlon*

(11) ■ [For further detail see order attached to the original minute order.]

| | | | number of notices | **Document Number** |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | 15 | |
| ✓ | Notices mailed by judge's staff. | | date docketed | 35 |
| | Notified counsel by telephone. | | APR 19 2002 | |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | 4/18/2002 | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| cb | courtroom deputy's initials | 02 APR 19 AM 9:17 | bb mailing deputy initials | |
| | | Date/time received in central Clerk's Office | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED
APR 1 9 2002

ROBERT HIGDON )
)
Plaintiff, ) No. 01 C 6972
)
v. ) Suzanne B. Conlon, Judge
)
ENTENMANN'S SALES COMPANY, INC., )
and INTERNATIONAL BROTHERHOOD OF )
TEAMSTERS LOCAL 734, )
)
Defendants. )

## MEMORANDUM OPINION AND ORDER

Robert Higdon ("Higdon") sues Entenmann's Sales Company, Inc. ("Entenmann's") and International Brotherhood of Teamsters Local 734 ("Local 734") for violations of § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 141 *et seq.* Specifically, Higdon claims Entenmann's breached the collective bargaining agreement with Local 734 by terminating him without just cause and for his union activity. Higdon also claims Local 734 breached its duty of fair representation by failing to adequately contest his suspension and termination. Entenmann's and Local 734 move for summary judgment pursuant to Federal Rule of Civil Procedure 56.

## BACKGROUND

The following facts are undisputed unless otherwise noted. Higdon worked for Entenmann's as a route sales representative. Higdon sold and delivered baked goods to retail stores. During the

1

relevant time period, Higdon's immediate supervisor was district sales manager Mike Getz. Getz reported to division sales manager Joe Schuch, who reported to regional sales manager Don Kay.

Local 734 represents Entenmann's route sales representatives, including Higdon. A collective bargaining agreement ("CBA") between Entenmann's and Local 734 governed the terms and conditions of Higdon's employment. The CBA provides:

> No employee shall be discharged except for just cause. [Entenmann's] will notify [Local 734] of any contemplated dismissal. Except in the case of dishonesty, fighting on the job, drunkenness, or the use of illicit or illegal drugs, [Entenmann's] will not discharge any employee without providing [Local 734] an opportunity to satisfactorily conclude the steps in the Grievance Procedure.

Plaintiff's 56.1 Statement of Facts ("Pl. Facts") ¶ 136. The CBA specifically prohibits Entenmann's from discharging an employee for engaging in union activity on personal time. The CBA also provides:

> [Entenmann's] may, in its sole discretion, make such rules and regulations concerning the conduct of its business as it may deem necessary, provided that the rules and regulations shall not conflict with the express terms of [the CBA]. [Entenmann's] agrees to furnish to [Local 734] a copy of any written regulations affecting employees who are members of the [bargaining unit] at least one week before any written regulation goes into effect.
>
> All employees must obey all reasonable rules and regulations established by [Entenmann's] covering job responsibilities, attendance, safety and personal conduct, including personal appearance.

Entenmann's 56.1 Statement of Facts ('Entenmann's Facts") ¶¶ 4-5. Entenmann's maintains rules preventing employees from stealing and using company funds for private purposes.

The CBA includes a three step grievance procedure to address any dispute between the employee and Entenmann's, including termination. Specifically, the CBA requires the business agent to first "take the grievance up with the supervisor in charge of the department." Pl. Facts ¶ 136. If an agreement is not reached and a written grievance is filed, the business agent then submits

2

the written grievance to Entenmann's designated representative. If an agreement is still not reached, Local 734 or Entenmann's may submit the grievance to arbitration.

A. **Higdon's Relationship with Local 734**

In 1996, Higdon unsuccessfully ran for an elected officer position of Local 734 on a slate ("Higdon's slate") opposing the slate of incumbent officers ("incumbent slate"). The incumbent slate was comprised of several individuals, including Robert Brooks and Vito Tribuzio. Following the election, Higdon's slate protested the election. Teamsters Joint Council No. 25 ("Joint Council") and the International Brotherhood of Teamsters ("IBT") denied the protest.

In 1999, Higdon's slate once again ran against the incumbent slate. During the campaign, Higdon's slate used Entenmann's offices after hours to prepare campaign materials. Incumbent slate supporters informed Entenmann's. Human resources director John Engler suspended the accused individuals, including Higdon. Higdon filed a charge against Entenmann's with the National Labor Relations Board ("NLRB") contesting the suspension.

Incumbent slate supporters also filed charges against Higdon's slate. Following a hearing, the Joint Council found Higdon's slate guilty of the charges. The Joint Council barred Higdon's slate from union membership for one year and from holding office for five years. IBT upheld the verdict, but reduced the penalty to $50.00 payable to Entenmann's as rent and the costs associated with posting notices to all members stating that Higdon's slate would desist from accepting any future contribution from any employer.

During the election, the incumbent slate produced and distributed flyers critical of Higdon and his slate. For example, one flyer stated that the police might charge Higdon with "grand larceny and theft for [his] midnight hijinks at [Entenmann's]." Pl. Facts ¶ 24. Another flyer accused Higdon

of conspiring with employers "in an effort to steal an election and attempt to weaken our union" and "trying to destroy our local" by "lying to us for the past three years, and even though they know that our members wouldn't elect them dog catcher, they are going to cause us to waste your dues money for their ego trips and smear tactics." *Id.* at ¶ 23. The flyer further stated, "No matter how you add it up - [Higdon's slate is] one big zero . . . and one big empty promise." *Id.*

The 1999 election was very close. Higdon lost by only 62 votes. Higdon's slate protested the election. The Joint Council and IBT denied the protest. According to Engler, Entenmann's continues to have a good business relationship with Local 734's leadership.

In 2000, Higdon ran against Brooks for a delegate position to IBT's 2001 convention. On October 27, 2000, Higdon filed a pre-election protest against Local 734, Brooks and Tribuzio, claiming that Brooks and Tribuzio refused to give him the delegate election plan. Brooks received a copy of the pre-election protest on October 30, 2001. Engler was aware of the pre-election protest filed by Higdon.

**B.     Higdon's Relationship with Entenmann's**

As part of his job duties, Higdon used a hand-held computer to keep a record of his activities, including the quantity of goods sold and delivered as well as any goods returned. Higdon also used the hand-held computer to record the amount of cash collected from Ozzie's Liquors, the only "cash stop" along his route. Entenmann's required route sales representatives to turn in their reports at the end of the day. Entenmann's settlement department then reviewed and audited the information. Based on the information contained in the end of day reports, Entenmann's generated a report showing the amount owed by each sales representative from their cash stops.

4

In early November 2000, settlement department supervisor Barbara Capperino informed Schuch that Higdon owed Entenmann's $3,723.32 from his only cash stop. On November 10, 2000, Schuch met with Higdon to inform him of his outstanding balance. Higdon told Schuch that the balance due was inaccurate. At this time, Entenmann's was aware that nearly all of the 226 route sales representatives had received inaccurate reports regarding the amount due from cash stops.

On November 13, 2000, Schuch posted a memorandum reminding all sales representatives to turn in their cash stop money with their end of day reports. That same day, Schuch, after consulting with Kay, issued Higdon a documented verbal warning for not turning in the money collected from his cash stop in a timely manner for a two year period. Higdon did not grieve the disciplinary action. Instead, Higdon asked for a full accounting of the cash collected at his cash stop. Thereafter, Higdon turned in the cash he collected on a daily basis.

When Engler learned of the warning, he contacted Schuch. Engler told Schuch that the conduct underlying the warning required an investigation. Schuch told Engler that other route sales representatives were not turning in their cash receipts on a daily basis. Engler did not ask for their names. Instead, Engler asked Capperino to audit Higdon's cash stop activity for the past several years. At the end of the year, Higdon once again requested documentation regarding his outstanding balance.

In January 2001, Capperino provided Engler with a report summarizing Higdon's cash stop activity for the previous two years. Capperino substantiated $2,658.84 of the original $3,723.32 outstanding balance. On February 16, 2001, Engler met with Higdon to give him a copy of Capperino's report. Engler suspended Higdon pending termination and further investigation.

The next day, Higdon filed a grievance contesting the suspension. On February 20, 2001, Higdon attended a grievance meeting with Engler and Brooks. At the grievance meeting, Higdon presented receipts for approximately $350.00 in payments that were not reflected in Capperino's report. Higdon pointed out that Capperino's report was overstated by approximately $50.00 in cash collected on days that he was not working. Finally, Higdon claimed that several route sales representatives, including Garcia, Kouba and Thomas, carried similar outstanding balances. At the end of the grievance meeting, Brooks requested that Higdon be reinstated with back pay. Engler continued Higdon's suspension pending further investigation.

On February 22, 2001, Higdon filed a second pre-election protest against Engler, Schuch, Kay and Brooks alleging that he was suspended because of his union activity. Higdon accused Brooks of not representing him properly because of the conflict of interest presented by the pending pre-election protest. On February 23, 2001, Brooks and Engler received a copy of the second protest.

On February 26, 2001, Higdon delivered a check to Engler in the amount of $2,658.84. According to Higdon, he tendered the last balance due believing Entenmann's would refund any overpayment based on its investigation. On March 12, 2001, Entenmann's terminated Higdon's employment for failing to remit cash receipts in a timely manner. On March 13, 2001, Higdon filed a grievance contesting his termination. Brooks did not request a grievance meeting. Rather, Brooks spoke with Engler about reinstating Higdon, but they did not reach an agreement. On March 26, 2001, Engler sent a letter to Local 734 denying Higdon's grievance.

On April 10, 2001, Brooks presented Higdon's case to Local 734's executive board for a determination regarding arbitration. Brooks did not tell the executive board, which was comprised of members of the incumbent slate, that other route sales representatives may have outstanding

balances. The executive board referred the matter to Local 734's attorney. Thereafter, the executive board decided against arbitration, equating Higdon's conduct to theft.

After Higdon's termination, Capperino informed Engler and Schuch that other route sales representatives had outstanding balances. As of November 6, 2000, Kouba owed $340.49, Thomas owed $650.49 and Garcia owed $3,371.00, a portion of which was attributed to a hand-held computer failure. Kouba, Thomas and Garcia were not disciplined for outstanding balances. Engler suspended George Montgomery for failing to remit money from his cash stops in a timely manner over a three month period. Montgomery, who had failed to turn in money from his cash stops on a daily basis after the November 13, 2000 reminder, owed $1,500.00. Montgomery wrote a bad check for the outstanding balance. Montgomery was then given the option of involuntarily resignation or termination. Although Montgomery initially resigned, Entenmann's terminated Montgomery's employment on May 1, 2001.

## DISCUSSION

### I. Standard of Review

Summary judgment is appropriate when the moving papers and affidavits show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once a moving party has met its burden, the non-moving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Silk v. City of Chicago*, 194 F.3d 788, 798 (7th Cir. 1999). The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the party opposing the motion. *Bay v. Cassens Transport Co.*, 212 F.3d 969, 972 (7th Cir. 2000). A genuine issue of material fact exists when "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000).

## II. Breach of the CBA

Section 301 of the LMRA confers jurisdiction on the district court to enforce the terms of collective bargaining agreements. 29 U.S.C. § 185. Where the employee has sued both the employer for breach of the collective bargaining agreement and the union for breach of its duty of fair representation, the suit is considered a "hybrid 301" action. *Crider v. Spectrulite Consortium, Inc.*, 130 F.3d 1238, 1241 (7th Cir. 1997). In order to succeed in this hybrid 301 action, Higdon must prove both of his claims. *See Id.*

### A. Termination Without Just Cause

Under the CBA, Entenmann's may terminate an employee only for just cause. "Just cause is a flexible concept, embodying notions of equity and fairness." *Crider*, 130 F.3d at 1241, *quoting Arch of Illinois, Div. of Apogee Coal Corp. v. District 12, United Mine Workers of America*, 85 F.3d 1289, 1294 (7th Cir. 1996). In order to be just, the penalty must be consistent with the seriousness of the offense. *Id.* at 1242.

Entenmann's contends Higdon was terminated for just cause. Higdon argues that Entenmann's response to the outstanding balances of several route sales representatives, including his, contradicts Entenmann's position that his outstanding balance was serious enough to warrant termination. Indeed, Schuch responded to Higdon's outstanding balance by issuing a documented verbal warning. Engler waited four months after learning of Higdon's original outstanding balance and two months after learning of his revised outstanding balance to terminate Higdon's employment.

8

Prior to Higdon's termination, Engler did not confirm whether other route sales representatives carried outstanding balances. Capperino later informed Engler that Kouba, Thomas and Garcia carried outstanding balances of $340.49, $650.49 and $3,371.41, respectively, in November 2000. Although Kouba and Thomas' balances were relatively small, Garcia owed almost as much as Higdon for at least a ten month period. Entenmann's ultimately adjusted both Garcia and Higdon's outstanding balances downward to reflect system and/or accounting errors. Garcia was not disciplined.

Entenmann's offers evidence that it terminated Montgomery two months after Higdon for carrying an outstanding balance of $1,500.00 for a three month period. Higdon claims Montgomery is not comparable because: (1) he failed to turn in his cash stop money daily after Schuch posted the November 13, 2000 reminder; (2) Montgomery issued a check drawn on insufficient funds to pay the outstanding balance; and (3) Entenmann's gave Montgomery the option of resigning. Based on this evidence, a reasonable jury could conclude Garcia is comparable to Higdon, while Montgomery is not. Accordingly, Higdon raises a genuine issue of material fact as to whether he was terminated without just cause in violation of the CBA.

## B. Termination for Union Activity

Higdon contends Entenmann's violated the CBA by terminating him for his union activity. The CBA specifically prohibits Entenmann's from discharging any employee for engaging in union activity on their own time. Entenmann's argues that Higdon cannot establish a causal connection between his termination and his union activity. The timing of the discharge alone may provide the necessary causal nexus where the adverse action follows fairly soon after the protected activity. *See Fyfe v. City of Fort Wayne*, 241 F.3d 597, 601-02 (7th Cir. 2001). Engler terminated Higdon's

9

employment approximately two weeks after Higdon lodged a protest against several Entenmann's employees, including Engler, alleging that he was suspended because of his union activity. This time period supports a reasonable inference Higdon was fired because of his union activity.

Entenmann's claims that Higdon's termination was in motion long before Higdon filed the protest. Specifically, Capperino, who did not have any knowledge of Higdon's union activity, informed Schuch of Higdon's outstanding balance in November 2000. However, Schuch responded to Capperino's concern by issuing Higdon a documented verbal warning. Thereafter, Engler, who knew that other route sales representatives may have outstanding balances, asked Capperino to audit only Higdon's route. Engler's request followed Higdon's first pre-election protest against Local 734, Brooks and Tribuzio by approximately three weeks. Given Entenmann's good business relationship with Local 734's current leadership, Higdon raises a genuine issue of material fact as to whether he was terminated because of his union activity in violation of the CBA.

## III. Breach of Duty of Fair Representation

Finally, Higdon claims Local 734 breached its duty of fair representation by failing to adequately contest his suspension and termination. A union breaches its duty of fair representation in handling a grievance when its conduct is arbitrary, discriminatory or in bad faith. *Crider*, 130 F.3d at 1243. Higdon claims the union's failure to adequately contest his suspension and termination was discriminatory and in bad faith. The subjective motivation of the union officials must be considered in determining whether the union's conduct was discriminatory or in bad faith. *Id.*

At the time of his suspension in February 2000, Higdon was running against Brooks for a delegate position. Indeed, the pre-election protest filed by Higdon against Brooks in October 2000 was still pending. Nevertheless, Brooks represented Higdon at the grievance meeting held in

connection with Higdon's suspension. At the grievance meeting, Higdon informed the attendees, including Brooks, that other route sales representatives, including Garcia, Kouba and Thomas, carried similar outstanding balances. After the grievance meeting, Higdon filed a second pre-election protest against Engler and Brooks, alleging he was suspended for his union activities. Higdon claimed the conflict of interest presented by the first pre-election protest prevented Brooks from properly representing him. Engler fired Higdon approximately two weeks later.

After his termination, Higdon filed a second grievance. This time, Brooks did not request a grievance meeting. Rather, Brooks spoke to Engler privately without Higdon present. When Engler denied Higdon's grievance, Brooks presented Higdon's case to the executive board for a decision on arbitration. The executive board was comprised of the same individuals who criticized Higdon during the very close 1999 election. Brooks did not tell the executive board that other route sales representatives might have similar outstanding balances. Indeed, Brooks had not investigated the outstanding balances of the sales representatives named by Higdon during the grievance meeting, including Garcia, Kouba and Thomas.

A union may breach its duty of fair representation by intentionally undermining an employee's grievances based on his political allegiances within the union. *Thomas v. United Parcel Service, Inc.*, 890 F.2d 909, 923 (7th Cir. 1989). In *Conn v. GATX Terminals Corp.*, 18 F.3d 417, 421 (7th Cir. 1994), the Seventh Circuit recognized that a union member may have a valid claim if his representative tainted the grievance process with personal hostility. Drawing all reasonable inferences in favor of Higdon, a reasonable jury could find that Local 734, through Brooks and/or the executive board, intentionally undermined Higdon's grievance based on his political affiliation.

Accordingly, Higdon raises a genuine issue of material fact as to whether Local 734 breached its duty of fair representation by failing to adequately contest his suspension and termination.

## CONCLUSION

Entenmann's and Local 734's motions for summary judgment are denied.

April 18, 2002

ENTER:

Suzanne B. Conlon
United States District Judge